IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Shannon Muldrow,
17248 Breeders Cup Drive
Odessa, FL 33556

Plaintiff

v.

William Barr,
Attorney General of the United States,
named in his Official Capacity, and
head of the Department of Justice

U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Defendant.

CIVIL ACTION NO.

JURY DEMANDED

## COMPLAINT

1.     Plaintiff, Shannon Muldrow, through the undersigned attorneys, respectfully alleges as follows:

## NATURE OF ACTION

2.     This is a civil action seeking monetary damages and declaratory and injunctive relief, brought on behalf of Shannon Muldrow, a female Special Agent with the Federal Bureau of Investigation (FBI) in the Tampa Field Office, for disparate impact

on the basis of sex, disparate treatment on the basis of sex, and retaliation in violation of Title VII of the Civil Rights Act of 1964.

## JURISDICTION AND VENUE

3.     Jurisdiction is proper in this court in that the district courts have original jurisdiction over Title VII under 28 U.S.C. § § 1331 and 1343 and 42 U.S.C. § 2000e-5(f)(3), because they arise under the laws of the United States and are brought to recover damages for deprivation of civil rights.

4.     Venue is proper in this judicial district under 28 U.S.C. § §1391(b)-(c) and 42 U.S.C. § 2000e5(f)(3), because Defendant's headquarters is located in this district, the personnel records relevant to this case are in this district, and the personnel practices challenged herein were directed or supervised by Defendant in this district.

## ADMINISTRATIVE PROCEDURE

5.     Plaintiff Shannon Muldrow has exhausted her administrative remedies prior to bringing this suit in that the Plaintiff has filed timely charges of discrimination.

6.     On September 12, 2019, Special Agent Muldrow timely sought informal resolution of her claims of discrimination based on sex and parental status, as well as for personal favoritism and non-merit facts, with the FBI Office of Equal Employment Opportunity Affairs (OEEOA). Those informal efforts were not successful.

7.     On or about October 16, 2019, Special Agent Muldrow timely filed a discrimination complaint with the FBI OEEOA for discrimination based on sex and parental status (First EEO Complaint).

8.    More than 180 days have passed since the filing of the first complaint and the OEEOA has taken no action on that case since that filing.

9.    On January 16, 2020, Special Agent Muldrow timely notified EEO Counselor Williams of continued retaliatory action taken by Assistant Special Agent in Charge (ASAC) Kristin Rehler, unknown members of an LCB, and Special Agent in Charge (SAC) Michael McPherson, and sought informal resolution. Informal resolution efforts were not successful.

10.    On February 24, 2020, Special Agent Muldrow filed a Discrimination Complaint with the EEO (Second EEO Complaint). The retaliatory actions and events giving rise to the filing of the Second EEO Complaint relate to the LCB process for the Squad 9 SSA position and ASAC Rehler's role as Chairperson for the LCB.

11.    More than 180 days have passed since the filing of the second complaint and the OEEOA has taken no action on that case since that filing.

12.    Plaintiff timely filed a third, related complaint before the OEEOA on June 12, 2020. Although the 180-day period has not yet elapsed, the allegations are related and arise out of the same set of operative facts as the first two complaints, making those allegations properly included and alleged in this Complaint.

## PARTIES

13.    Defendant William Barr is the Attorney General of the United States, and is sued here in his official capacity as head of the Federal Bureau of Investigation.

14.    Plaintiff Shannon Muldrow (referred to herein as "Plaintiff" or "Special Agent Muldrow") is a female resident of the State of Florida and is employed by the FBI as a Special Agent, assigned to the Tampa Field Division.

## FACTUAL BACKGROUND

## SPECIAL AGENT SHANNON MULDROW

15.    Plaintiff Shannon Muldrow is a female Special Agent with the FBI, with a distinguished record during her more than 20-year career with the Bureau. Special Agent Muldrow earned a Bachelor of Arts degree in two majors, Political Science and History, *cum laude*, from the State University of New York at Buffalo in 1993. Special Agent Muldrow earned a law degree (Juris Doctor) in 1996 from the University of Buffalo School of Law. After graduating from law school, Special Agent Muldrow took and passed both the New York and Florida bars, and remains a member of both the New York and Florida bars.

16.    After passing the New York and Florida bars and until April 1998, Special Agent Muldrow practiced law in the private sector in Buffalo, New York. From April 1998 to November 1999, Special Agent Muldrow served as an Assistant State Attorney at the Broward County State Attorney's Office, leaving that position for the FBI (December 1999) and to attend the FBI Academy in Quantico, Virginia. In 2000, Special Agent Muldrow graduated from the FBI Academy and was assigned to the Tampa Field Division.

17.     From April 2000 to April 2001, Special Agent Muldrow was assigned to Squad 5, in Tampa, whose programs included Organized Crime (Transnational Organized Crime Western Hemisphere), Drugs, and Violent Crime.

18.     From May 2001 to May 2004, Special Agent Muldrow was assigned to the Sarasota Resident Agency (Operation Panama Express), which was under the Programs of Organized Crime (Transnational Organized Crime Western Hemisphere). Special Agent Muldrow also worked on terrorism matters, including working in the Military Liaison and Detainee Unit (May to June 2003).

19.     In 2003, Special Agent Muldrow married and her spouse was employed at the time, and until September 2019, by the United States Attorney's Office in Tampa. From October 2019 to the present, Special Agent Muldrow's spouse has been serving in the United States Attorney's Office for the District of Puerto Rico. Special Agent Muldrow and her spouse have three minor children. Special Agent Muldrow is the primary and maternal caregiver for her three minor children, including a child with special learning challenges (dyslexia).

20.     From June 2004 to April 2005, Special Agent Muldrow was assigned to the Field Intelligence Group (FIG), which covered all FBI programs.

21.     From May 2005 to March 2019, Special Agent Muldrow was assigned to the Pinellas Resident Agency (PRA), where she handled a variety of programs including White Collar Crime (Health Care Fraud, Identity Theft, and Money Laundering), Public Corruption, Civil Rights, Terrorism, and Organized Crime.

22.     During a portion of her service at PRA, Special Agent Muldrow served as one of the Relief Supervisors and, as such she acted in a supervisory role when the Supervisory Special Resident Agent (SSRA) was out of the office.

23.     Special Agent Muldrow also served as the Acting Supervisory Special Resident Agent (A/SSRA) for PRA for 72 days from November 2018 to January 2019. During that period, Special Agent Muldrow, among other things, met with leaders in local law enforcement, improved relations with law enforcement partners, implemented a Threat to Life protocol and ran a PRA awards ceremony for law enforcement partners. The FBI recognized Special Agent Muldrow's performance as A/SSRA with a Citation for Special Achievement.

24.     From March 2019 to the present, Special Agent Muldrow has been assigned to Squad 10 in Tampa, which handles the White-Collar Crime program (Health Care Fraud, Identity Theft, and Money Laundering), including serving as a Relief Supervisor. From February 25, 2020, to the present, Special Agent Muldrow has been assigned to be the PRS for Squad 10. During the period from March 20, 2020 to April 2, 2020, and on other specific dates, Special Agent Muldrow served as the Acting Supervisory Special Agent (A/SSA) for Squad 10.

25.     From July 8, 2020, to August 5, 2020, Special Agent Muldrow worked in San Juan, Puerto Rico, on a Specialty TDY at the San Juan Field Office.

26.     Throughout Special Agent Muldrow's career, she has consistently received positive and favorable performance ratings, to include outstanding and exemplary performance ratings.

27.    Throughout Special Agent Muldrow's career with the FBI, she earned and has maintained an outstanding reputation with, among others, law enforcement colleagues and partners, prosecutors and support staff at the United States Attorney's Office for the Middle District of Florida, defense counsel, and members of the judiciary in the Middle District of Florida.

## SPECIALIZED TRAINING

28.    Throughout Special Agent Muldrow's career she has participated in specialized training and conferences, both as a student and a presenter, including, but not limited to, the following: (1) Continuing Legal Education (CLE) for the New York and/or Florida bars (1996 to present); (2) Basic Money Laundering in-service (2000); (3) Survival Awareness in-service (2001); (4) Advanced Money Laundering (2001); (5) The Reid Technique of Interviewing and Interrogation Course (2002); (6) National Crisis Negotiation Course (2003); (7) Asset Informant Conference (2004); (8) Basic Health Care Fraud in-service (2005); (9) National Health Care Anti-Fraud Association (NHCAA) Conference (2008); (10) NHCAA Conference (2010); (11) Instructor Development Course (2011); (12) Legal Advisor Certification Course (2011); (13) NHCAA Conference (2013); and (14) Special Agent Assessor Orientation Training (2019).

## AWARDS & COMMENDATIONS

29.    During her service as a Special Agent in the Tampa Field Division, Special Agent Muldrow has earned, among others, the awards, commendations, and nominations for awards and commendations listed below.

(1)     Nominated: Rookie of the Year (2000);

(2)     Between 2001 and 2004, the period at the Sarasota Resident Agency (Operation Panama Express), awarded an FBI Certificate of Achievement (2001); FBI Certificate of Achievement: National Drug Control Strategy Resulting in Record Cocaine Seizures for Years 2000, 2001, and 2002 (2003); FBI Certificates of Commendation for Source Recruitment and Development (2003); FBI Certificate of Commendation (PanEx Case); and U.S. Interdiction Coordinator National Award. Nominated: FBI Director's Award and the Department of Justice's Attorney General Award;

(3)     Nominated: FBI Quality Step Increase Award (2004);

(4)     Five Outstanding Law Enforcement Officer Awards, U.S. Attorney's Office for the Middle District of Florida (2012, 2015, 2016, 2017, and 2018);

(5)     Nominated: DOJ Attorney General Award; received FBI Incentive Award (Approx. 2013);

(6)     FBI Citation for Special Achievement (2015);

(7)     Tampa Region Financial Crimes and Inspectors General Council, Special Achievement Award for Teamwork (2015);

(8)     Four Tampa Region Financial Crimes and Inspectors General Council, Special Achievement Awards for Case of the Year (2016, 2017, 2018, and 2019);

(9)     Health and Human Services, Office of Inspector General, Exceptional Achievement Award (2016);

(10)    Tampa Region Financial Crimes and Inspectors General Council, Special Achievement Award for Significant Contributions (2016);

(11)    Medal of Excellence, Federal Bureau of Investigation (2018);

(12)    Health and Human Services, Office of Inspector General, National Cooperative Achievement Award (2018);

(13)    Nominated: DOJ Attorney General Award (2018);

(14)    FBI Citation for Special Achievement (2019), with respect to supervisory work as the Acting Supervisory Special Resident Agent (A/SSRA) for the PRA;

(15)    FBI Citation for Special Achievement (2020);

(16)    Nominated: FBI Director's Award (2020);

(17)    Nominated: DOJ Attorney General Award (2020); and

(18)    Nominated: DOJ Attorney General Award (2020).

## FACTUAL ALLEGATIONS

## DISCRIMINATION BECAUSE OF SEX

### SA Muldrow Applies for Squad 10 SSA

30.    In May 2019, Special Agent Muldrow applied for the Squad 10 SSA position that had been posted as Flex by the previous Tampa Field Division SAC, which allowed Special Agent Muldrow to compete on an equal footing (as a Tier I candidate) with candidates from FBIHQ. Twenty-two people applied for the Squad 10 SSA position.

31.    Such a position is managed by policies and procedures governing SA midlevel management selections and development known as the Special Agent Midlevel Management Selection System (SAMMS) Policy Guide.

32.    The SAMMS Policy Guide, Section 3. Policies section stations that, "SA candidate for midlevel (GS-14/GS-15) positions must be selected for advancement

based on merit, in a fair and equitable manner, and through the use of a standard application process and rating system."

33.    The SAMMS Policy Guide provides that a Local Career Board ("LCB") shall be convened for each position where the voting members rate all examples for all competencies for all candidates prior to convening the LCB, conduct interviews of the selected candidates applying specific guidelines including the requirements that all interviews be assessed using anchors, and following the interviews rank as many candidates as are deemed qualified.

34.    Acting Special Agent in Charge ("ASAC") Kristin Rehler served as the Chairperson (a non-voting member) for the LCB for the Squad 10 SSA position, chose the members of the LCB that would vote on this promotion, and selected the questions to be asked during the interview.

35.    ASAC Rehler selected the then-serving Squad 10 SSA (A.S.) to serve on the LCB, along with two other supervisors. SSA A.S. had supervised Squad 10 for approximately seven years and played a key role in the decision-making process regarding his successor.

36.    The LCB rated Special Agent Muldrow as the number one ranked candidate. The Core Competencies for this position, each with two examples, were: (1) Leadership; (2) Problem Solving/Judgment; (3) Collaboration; and (4) Organizing and Planning. A Secondary Competency was Criminal – White Collar Crime.

37.    Special Agent Muldrow received three exemplary votes (which are rare); fourteen skilled votes; and thirteen competent votes. In the two Leadership

Competency examples, Special Agent Muldrow received five competent votes and one skilled vote, resulting in a competent rating in Leadership.

38.    ASAC Rehler and SSA A.S. had a pre-selected, favored male candidate ("J.B.") for the Squad 10 SSA position and they both knew that J.B. worked at FBIHQ.

39.    SSA A.S. told Special Agent Muldrow that he had spent hours rewriting J.B.'s FD-954, because it never would have worked for the Squad 10 posting and SSA A.S. told another agent that he had written J.B.'s FD-954.

40.    The FD-954 is the only (and therefore a critical) document upon which a candidate is ranked by the LCB and ranking determines whether a candidate will be interviewed.

41.    Even though SSA A.S. participated in writing J.B.'s FD-954, he also participated as a voting member on the LCB in violation of FBI policy and Federal Merit System Principles against favoritism, impropriety, and appearance of impropriety.

42.    Although SSA A.S. knew that Special Agent Muldrow was competing for the Squad 10 SSA position, SSA A.S. told another agent that his replacement would come from outside the division – hence, SSA A.S. believed that Special Agent Muldrow would not be his replacement.

43.    Specifically, during the active posting period for the Squad 10 SSA position, but before the interview and final rankings, another FBI agent asked SSA A.S. when he would step down from the position. SSA A.S. said that he would step down in November 2019, in order to give his replacement time to transfer to the Tampa

Division. The agent then questioned in his/her mind how SSA A.S. knew that the replacement would not be Special Agent Muldrow.

44.     Before the interview, ASAC Rehler told Special Agent Muldrow that SSA A.S. would likely be an observer for the Squad 10 SSA position. Neither ASAC Rehler nor SSA A.S. advised Special Agent Muldrow that SSA A.S. would be a voting member of the LCB that would select the candidate for SSA A.S.'s position.

45.     The LCB ranked Special Agent Muldrow as the number one candidate. As the number one ranked candidate, Special Agent earned an interview before the LCB. On July 11, 2019, Special Agent Muldrow interviewed for the Squad 10 SSA position before ASAC Rehler's LCB, which included SSA A.S. and two other supervisors as voting members.

46.     Two other candidates, including J.B., interviewed for the SSA position, meaning J.B. would have ranked number two or three. After the interview, ASAC Rehler contacted FBIHQ to discuss un-ranking Special Agent Muldrow and the other two candidates. The pretextual and improper justification ASAC Rehler used to un-rank Special Agent Muldrow was a purported lack of leadership skills.

47.     On August 7, 2019, the SAMMS Board for the Squad 10 SSA position met and, later that day, ASAC Rehler contacted Special Agent Muldrow by telephone to advise her that she had not been selected for the position.

## Reposting of Squad 10 SSA

48.     On or about Monday, August 19, 2019, SAC McPherson asked Special Agent Muldrow to come to his office. During this meeting, SAC McPherson addressed

Special Agent Muldrow's allegation involving SSA A.S.'s substantial re-writing of J.B.'s FD-954, stating that there was nothing wrong with SSA A.S. having "helped" J.B. on his FD-954 (Special Agent Muldrow alleged that SSA A.S. had done much more than merely "help"). SAC McPherson did not address the appearance of impropriety and the inherent conflict of interest in SSA A.S. serving on the LCB.

49.    SAC McPherson told SA Muldrow that he decided to post the Squad 10 SSA position as Non-Stationary, saying that he was a "Non-Stationary guy", meaning that he did not believe in Flex postings and that the job would be re-posted as Non-Stationary -- not Flex. In response, SA Muldrow advised SAC McPherson that she intended to file a formal appeal with FBIHQ and would do so the next week.

50.    The effect of re-posting the position as Non-Stationary was that Special Agent Muldrow would automatically be ranked as a Tier II candidate.

51.    The FBI Tiering Policy for Field SSA positions directly impacts on the ranking of candidates. Specifically, all qualified Tier I candidates must be ranked higher than qualified Tier II and Tier III candidates, regardless of ratings. This Tiering Policy results from the manner in which the promotion is posted. An SSA position posted as Stationary results in a preference for field agents from the Division where the vacancy exists, who are Tier I candidates, while FBIHQ SSA candidates are ranked as Tier II candidates. An SSA position posted as Non-Stationary must rank a candidate from FBIHQ as a Tier I candidate, while an agent in the field must be ranked as a Tier II candidate. If an SSA position is posted as Flex, both FBIHQ and field agents from the

office where the vacancy exists are both treated as Tier I candidates. *See* SAMMS Policy Guide, Section 5.2.2.9.5. (Applying the Tiering Policy to Field SSA Positions).

52.    There is no requirement for promotion to a Field EDSP GS-14 SSA or Term SSRA position that a special agent have served at FBIHQ, including no requirement that a special agent have worked at FBIHQ for any period of time on a temporary duty travel (TDY) assignment.

53.    On August 22, 2019, Tampa Division Executive Management (hereinafter "EM") re-posted the Squad 10 SSA position as Non-Stationary.

54.    Tampa Division EM's re-posting the Squad 10 SSA position as Non-Stationary ensured that Special Agent Muldrow would be a Tier II candidate and not competitive with Tier I candidates from FBIHQ, such as J.B. -- the pre-selected, favored male candidate.

55.    Upon information and belief, after J.B. was unranked during the first promotion selection process, ASAC Rehler encouraged J.B. (indirectly through J.B.'s supervisor) to reapply for the job with the expectation and encouragement that J.B. would do better the second time.

56.    Notwithstanding the fact that Special Agent Muldrow was the number one ranked candidate during the first LCB, Tampa Division EM intentionally retaliated and discriminated against Special Agent Muldrow by re-posting the Squad 10 SSA position as Non-Stationary for her protected activity and was also based on discrimination based on Special Agent Muldrow's sex and parental status.

57.     ASAC Rehler and SSA A.S.'s pre-selected, favored male candidate (J.B.) re-applied for the Squad 10 SSA position and, because J.B. was at FBIHQ, J.B. became a Tier I (preferred) candidate.

### SA Muldrow Applies for Squad 9 SSA

58.     On or about October 7, 2019, Tampa Division EM posted Job Number 20191232 for the Squad 9 SSA position as Flex. Tampa Division EM posted the job as Flex to allow the pre-selected, favored male candidate (R.B.), to be competitive for this job.

59.     Tampa Division EM's posting of the Squad 9 SSA position as Flex directly contradicts with SAC McPherson's claim that he is a "Non-Stationary guy." This Flex posting further demonstrates the retaliatory nature of the Non-Stationary re-posting of the Squad 10 SSA position and the disparate, discriminatory treatment of Special Agent Muldrow when compared to pre-selected, favored male candidates.

60.     ASAC Rehler served as the Chairperson for this LCB and as the minority LCB representative because Special Agent Muldrow was a minority (female) candidate. At the time of this LCB, ASAC Rehler served as R.B.'s direct supervisor.

61.     Ten candidates applied for the Squad 9 SSA position, including Special Agent Muldrow. ASAC Rehler's LCB artificially rated R.B.'s FD-954 extremely high. ASAC Rehler's LCB then set a high bar to qualify applicants for the interview. Due to R.B.'s artificially high LCB scores and the high bar set to qualify for an interview, R.B. was the only candidate ranked and interviewed for this position out of ten applicants.

62.    The SAMMS board rules recommend that three candidates be interviewed for an SSA position. As the only candidate ranked and interviewed, Tampa Division EM assured that their pre-selected, favored male candidate, R.B., would be awarded the Squad 9 SSA position.

## DISCRIMINATION BASED ON DISPARATE IMPACT THEORY

63.    After being ranked as the number one candidate for the Squad 10 SSA position in August 2019, and later being told that the SAMMS Board had not selected Special Agent Muldrow for the position, ASAC Rehler called Special Agent Muldrow to inform her that she was not selected telling Special Agent Muldrow, among other things, the following:

a.    ASAC Rehler told Special Agent Muldrow that while she was the number ranked applicant before the interview, she did not get the job because she failed to demonstrate leadership in the interview.

b.    Special Agent Muldrow asked ASAC Rehler what anchors she used when she decided that Special Agent Muldrow lacked leadership in the interview and ASAC Rehler said that she did not use anchors nor did she need to in an interview;

c.    Special Agent Muldrow told ASAC Rehler that, if she did not use anchors in the interview, the determination that Special Agent Muldrow failed to demonstrate leadership was subjective [and hence improper and in violation of FBI policies] and not objective;

d.     ASAC Rehler told Special Agent Muldrow that training agents to work cases was not leadership and that managing people was leadership;

e.     Significantly, ASAC Rehler told Special Agent Muldrow that people make choices and unsolicited brought up the fact that she knew that Special Agent Muldrow had "family commitments," but that Special Agent Muldrow had made a choice.

f.     ASAC Rehler said that she had told Special Agent Muldrow that she needed to do a TDY to FBIHQ [in Washington, DC] when she met with Special Agent Muldrow a few months ago.

g.     Special Agent Muldrow told ASAC Rehler that she could not do a TDY because she could not get child care.

h.     Special Agent Muldrow told ASAC Rehler that the agent recently awarded the SSRA position at PRA did not do a TDY but was still promoted and ASAC Rehler said that it was a different job and a different board (LCB).

i.     ASAC Rehler stated that she had told Special Agent Muldrow in the past that she needed leadership experience, and, in that context, said she had told Special Agent Muldrow that she needed to do a TDY at FBIHQ.

j.     ASAC Rehler told Special Agent Muldrow that the position would be re-posted but was unsure how it would be reposted. Special Agent Muldrow advised ASAC Rehler that if the position was re-posted as Non-Stationary it would make her non-competitive (because she would be classified as a Tier II

Candidate). SA Muldrow further expressed to ASAC Rehler her concern that Tampa Division EM intended to do just that.

64.    It is more difficult for female FBI agents who have minor children to leave their family to work for extended periods of time on TDYs at FBIHQ in Washington, D.C. than it is for male FBI agents to do so. ASAC Rehler used this practice to discriminate intentionally against SA Muldrow by requiring Special Agent Muldrow to complete a TDY before being promoted.

65.    This policy, requiring female agents, including Special Agent Muldrow, to do a TDY at FBIHQ or a more permanent transfer to FBIHQ, has a disparate impact on female agents. Bureau of Labor Statistics data supports this conclusion, as summarized in its April 18, 2019, News Release. That data reflects that, in 2018, in married couple families, only 5.8% of the time did the mother and not the father work. By contrast, in 24.1% of married families, only the father worked.

66.    When an FBI agent's spouse does not work, that agent can more easily take a TDY or assignment to FBIHQ while the non-working spouse stays in the district with their minor children.

67.    ASAC Rehler and SSA A.S. were aware, during the period that Special Agent Muldrow was applying and competing for the Squad 10 SSA position, that Special Agent Muldrow's husband would likely be relocating to Puerto Rico to take a position with the U.S. Attorney's Office in Puerto Rico. ASAC Rehler and SSA A.S. knew that Special Agent Muldrow would remain in Tampa with her minor children.

68.     It is more difficult for female FBI agents, such as Special Agent Muldrow, who have minor children to transfer to FBIHQ in Washington, D.C.

69.     FBI promotional policies provide for greater potential for agents to compete for and earn promotions if they are assigned to work at FBIHQ.

70.     Tampa Division EM later re-posted the Squad 10 SSA position as Non-Stationary. Pursuant to FBI policy, a Non-Stationary posting gives preferential (Tier I) treatment to agents working at FBIHQ. A Non-Stationary posting makes it virtually impossible for local (*e.g.*, Tampa-based) agents, like Special Agent Muldrow, to compete for SSA positions posted as Non-Stationary.

71.     FBI policy regarding Non-Stationary SSA postings, by itself, and as applied, has a disparate impact on female special agents and, in fact, had a discriminatory and disparate impact on Special Agent Muldrow's ability to compete for and earn a promotion, including for the Squad 10 SSA position.

72.     Tampa Division EM's decision to re-post the Squad 10 SSA position as Non-Stationary, thereby giving preferred status to FBIHQ agents, had a discriminatory and disparate impact on Special Agent Muldrow based on her sex and parental status.

73.     The FBI, through the discriminatory actions of ASAC Rehler, sought to compel Special Agent Muldrow to make a choice, as the primary, maternal caregiver for her minor children, between caring for her minor children and working away from her family on a TDY as a necessary precondition for being promoted.

74.     ASAC Rehler improperly considered Special Agent Muldrow's failure to take a TDY as a negative factor when un-ranking Special Agent Muldrow. These actions constitute sex discrimination.

75.     ASAC Rehler's considering Special Agent Muldrow's failure to take a TDY in un-ranking her for the Squad 10 SSA position violated SAMMS policy. SAMMS policy, Section 5.2.2.9.6. (Prohibited Activities), states that "[E]valuation of candidates on any factor not included in the job posting" is an action that is "prohibited by LCBs".

76.     Additional Flex postings, listed below, involving ASAC Rehler and Tampa Division EM took place before and after the Non-Stationary re-posting of the Squad 10 SSA position. Those Flex postings support and corroborate Plaintiff's allegations of Tampa Division EM's pattern and practice of violating and manipulating the SAMMS Policy Guide in the promotion practices of SSAs to achieve the desired result of promoting pre-selected, favored male candidates.

        a.     In or about 2018, Tampa Division EM posted Job Number 20180285 as Flex to allow a favored, pre-selected male Tampa candidate, R.M., to be competitive for the Squad 7 SSA position. The LCB rated R.M. second in this LCB. ASAC Rehler previously supervised R.M. and served as Chairperson on this LCB. After R.M. did not place number one in the LCB ranking, upon information and belief ASAC Rehler used her influence and recommended that the job be awarded to R.M. (the number two ranked, less qualified candidate).

b.      In or about 2019, Tampa Division EM posted Job Number 20190580 as Flex to allow a favored, pre-selected male Tampa candidate, K.T., to be competitive for the ORA3 SSA position. Tampa Division EM awarded K.T. this SSA position.

c.      In or about late 2019 or 2020, Tampa Division EM posted Job Number 20200425 as Flex to enable the pre-selected, favored Tampa candidate, N.N., to be able to compete for this job. ASAC Rehler supervised N.N. prior to his application for this position and Tampa Division EM awarded N.N. this Term Regional OCDETF Coordinator GS-14 Non-EDSP position.

## RETALIATION

77.    Special Agent Muldrow engaged in protected EEO activity under Section 704 of Title VII when she reported and filed complaints about ASAC Rehler's discrimination against her to officials in her chain of command and to the OEEOA.

## Protected EEO Activity

78.    On August 7, 2019, Special Agent Muldrow engaged in protected activity when she orally advised ASAC Rehler that she (ASAC Rehler) had not followed FBI policy in the interview and Squad 10 SSA selection process.

79.    On or about Monday, August 12, 2019, Special Agent Muldrow again engaged in protected activity when she met with FBI Special Agent in Charge of the Tampa Field Division, Michael McPherson.

80.     During that meeting, Special Agent Muldrow told SAC McPherson that ASAC Rehler's LCB and the selection process for the Squad 10 SSA position had been fraught with violations of the SAMMS Policy Guide.

81.     SA Muldrow catalogued to SAC McPherson a series of violations including, but not limited to: (a) ASAC Rehler's LCB not following SAMMS policy in the interview assessment and (b) favoritism and the appearance of impropriety.

82.     The SAMMS policy violations included ASAC Rehler's failure to use anchors during the interview and improperly weighing the leadership competency.

83.     Allegations of improper favoritism and appearance of impropriety included the fact that SSA A.S. had spent hours writing the FD-954 for the pre-selected, favored male candidate (J.B.), but still served as a voting member on the LCB.

84.     Upon information and belief, SAC McPherson and ASAC Rehler discussed Special Agent Muldrow's allegations regarding ASAC Rehler's failure to follow SAMMS policies during the first Squad 10 SSA LCB and the favoritism and appearance of impropriety and also discussed how the Squad 10 SSA position would be reposted, resulting in it being posted as Non-stationary.

### SBAC Appeal

85.     On or about Monday, August 26, 2019, Special Agent Muldrow filed a formal appeal with the SAMMS Board Appeal Committee (SBAC) at FBIHQ.

86.      The SBAC appeal raised the same issues regarding ASAC Rehler's failure to follow SAMMS policies in the LCB for the Squad 10 SSA position and the favoritism

and appearance of impropriety regarding SSA A.S.'s writing of the FD-954 for one of the candidates for the position and serving as a voting member on the LCB.

87.     Also, on or about August 26, 2019, Special Agent Muldrow delivered a large binder containing a courtesy copy of the formal SBAC appeal to the office of SAC McPherson -- ASAC Rehler was standing outside SAC McPherson's office. In the presence of ASAC Rehler, SA Muldrow placed the binder containing the formal SBAC appeal on the desk of SAC McPherson's secretary.

88.     Upon information and belief, ASAC Rehler was aware of the fact that SA Muldrow had previously advised SAC McPherson of her intent to file a formal complaint regarding ASAC Rehler's violations of SAMMS policies and other violations relating to the Squad 10 SSA LCB and SAC McPherson would have advised ASAC Rehler that SA Muldrow had filed the formal SBAC appeal, and the contents of that appeal.

89.     After filing the SBAC appeal, Special Agent Muldrow communicated with the Leadership Selection Unit Chief with respect to her formal appeal containing her protected disclosures and inquired regarding the status of the appeal.

90.     As of the date of the filing of this complaint, Special Agent Muldrow has not received any notification that the FBI has adjudicated her formal appeal. The failure to adjudicate Special Agent Muldrow's formal SBAC appeal constitutes a violation of FBI policies and further retaliatory action.

## EEO Activity

91.     Special Agent Muldrow first made an EEO Complaint on September 12, 2019. Following the initial EEO Complaint, Special Agent Muldrow faced retaliation by ASAC Rehler.

92.     On January 16, 2020, Special Agent Muldrow timely notified EEO Counselor Williams of continued retaliatory action taken by ASAC Rehler, unknown members of an LCB, and SAC McPherson.

93.     A second formal EEO Complaint for retaliation based on her prior EEO activity was filed on February 24, 2020.

94.     A third EEO Complaint was initiated on June 12, 2020 for continued discrimination and retaliation.

### Continued Acts of Retaliation

95.     Multiple actions have been taken against Special Agent Muldrow following her initial EEO activity are described as follows:

        a.      In March 2020, shortly after becoming A/SSA, Special Agent Muldrow demonstrated leadership by reaching out to federal, state, and local law enforcement partners to create a new Middle District of Florida COVID-19 Fraud Working Group ("COVID Task Force") and served as the main point of contact (POC) on behalf of the FBI.

        b.      On or about March 23, 2020, at 11:15 p.m., Special Agent Muldrow sent a group email to the COVID Task Force to announce to the new group that the group's first telephonic meeting was scheduled to take place in less than forty-eight hours.

c.     The next day, ASAC Rehler chastised Special Agent Muldrow for sending out an email after 8:00 p.m. and instructed Special Agent Muldrow that she was not to send out emails before 8:00 a.m. or after 8:00 p.m. This unprecedented email restriction negatively affected Special Agent Muldrow's ability to do her job amid a historic worldwide pandemic.

d.     Following Special Agent Muldrow's request for review of ASAC Rehler's email restrictions, SAC McPherson allowed Special Agent Muldrow to send emails as she determined appropriate

e.     ASAC Rehler's directive limiting the time that Special Agent Muldrow could send work-related emails constitutes petty retaliatory action against Special Agent Muldrow for her protected activity.

f.     On or about March 26, 2020, ASAC Rehler denied Special Agent Muldrow's request for authorization to seek funding from Tampa or FBIHQ Health Care Fraud Unit (HCFU) to purchase Microsoft Office for $249.99 for her HCF laptop in order to facilitate her work for the COVID Task Force.

g.     Following Special Agent Muldrow's request for review of ASAC Rehler's denial, SAC McPherson allowed Special Agent Muldrow to request funding for the purchase of the needed software.

h.     ASAC Rehler's denial of Special Agent Muldrow's request for funding is another example of petty retaliatory action against Special Agent Muldrow for her protected activity.

i.      Although Special Agent Muldrow had been serving as the FBI POC for the COVID Task Force in Tampa and had applied to serve in that role moving forward, on or about March 30, 2020, ASAC Rehler awarded that position to someone else.

j.      ASAC Rehler's removal of Special Agent Muldrow from her role as the FBI POC for the COVID Task Force and awarding that position to someone else constitutes retaliatory action against Special Agent Muldrow for her protected activity.

96.    At the beginning of the COVID-19 pandemic, the FBI created a policy where individuals could "self-identify" allowing special agents and other FBI personnel to opt-out of going to their respective FBI office due to health concerns for themselves or others in their family related to COVID-19. Special Agent Muldrow initially went on the "self-identify" status due to living with her elderly mother-in-law with underlying health conditions. In early July 2020, Special Agent Muldrow advised her supervisor that she intended to return to "self-identify" status, relating to the COVID-19 pandemic as numbers were rising in Florida. ASAC Rehler responded that FBI policy "has been very clear that [she could] not self-identify for a second time. Special Agent Muldrow later confirmed that there was no prohibition against SA Muldrow returning to "self-identify" status as ASAC Rehler indicated. ASAC Rehler's instruction that Special Agent Muldrow was not entitled to return to "self-identify" status constitutes retaliatory action against Special Agent Muldrow for her protected activity.

97.     In early July 2020, Special Agent Muldrow sought and received approval from Tampa Division EM to work for a 30-day period on a Specialty TDY to support the FBI San Juan Office in Puerto Rico (Special Agent Muldrow's spouse has been working in San Juan since October 2019 and Special Agent Muldrow was seeking a TDY in Puerto Rico so that she, her children, and her mother-in-law could be near her spouse and in an area better controlled during the COVID-19 pandemic). The earliest the TDY could begin would be July 8, 2020. On July 9, 2020, the Tampa Division backdated the start date of the TDY to July 6, 2020, and denied a travel day to return to Tampa, thereby shortening the TDY. Tampa Division EM's shortening of the authorized 30-day TDY period and denial of a travel day constitute retaliatory action against Special Agent Muldrow for her protected activity.

## FIRST CLAIM FOR RELIEF
### Violation of Title VII of the Civil Rights Act of 1964
### (Disparate Treatment on the Basis of Sex)

98.     Plaintiff repeats and realleges the allegations contained in paragraphs 11 through 97, inclusive, as if set forth fully herein.

99.     The discriminatory action described herein violated Plaintiff's rights protected by § 704(a) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3.

100.    ASAC Rehler and members of FBI EM have subjected Plaintiff to different treatment because of and on the basis of her sex. The intentional gender discrimination in the terms and conditions of Plaintiff's employment including the denial of job

promotions has allowed the FBI to continually promote the favored pre-selected male over a female.

101.    As a result of this conduct, Plaintiff has suffered harm, including, but not limited to, lost earnings, lost future employment opportunities, and other financial loss, as well as non-economic loss.

## SECOND CLAIM FOR RELIEF
## Violation of Title VII of the Civil Rights Act of 1964
## (Disparate Impact on the Basis of Sex)

102.    Plaintiff repeats and realleges the allegations contained in paragraphs 11 through 101, inclusive, as if set forth fully herein.

103.    The discriminatory actions described herein constitute a violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*

104.    ASAC Rehler, among other FBI EM, has discriminated against women, and the Plaintiff in particular, by maintaining uniform policies and practices that have a disparate impact on women.

105.    The FBI's policy and/or practice of permitting selecting officials to ignore the SAMMS Board Policy Guide, and the policy and/or practice of allowing selecting officials to designate SSA jobs as stationary, non-stationary, or flex without legitimate business reasons, and without establishing or enforcing rules on this practice produces an unjustified disparate impact on women, particularly on Plaintiff, with respect to the terms and conditions of her employment.

106.   As a result of the disparate impact of these policies, Plaintiff has been treated differently from and less preferentially than similarly situated male employees with respect to job assignments, promotions, and responsibilities.

107.   As a result of this conduct, Plaintiff has suffered harm, including but not limited to, lost earnings, lost future employment opportunities, and other financial loss as well as non-economic loss.

**THIRD CLAIM FOR RELIEF**
**Violation of Title VII of the Civil Rights Act of 1964**
**(Intentional Retaliation in Response to Protected Activity)**

108.   Plaintiff repeats and realleges the allegations contained in paragraphs 11 through 90, inclusive, as if set forth fully herein.

109.   The retaliatory action described herein violated Plaintiff's rights protected by § 704(a) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3.

110.   Plaintiff engaged in protected activity when she reported violations of Title VII to supervisors in her chain of command, to supervisory agents at FBIHQ, and to the OEEOA (Office of Equal Employment Opportunity Affairs) within the FBI.

111.   Plaintiff engaged in protected activity when she appealed the SAMMS Board decision to unrank her despite being the number one ranked candidate with the SAMMS Board Appeal Committee.

112.   Plaintiff engaged in protected activity when she filed multiple EEO Complaints.

113.    In retaliation for the above stated protected activity, ASAC Rehler unranked Plaintiff from consideration for the Squat 10 SSA position, participated in reposting the position as Non-Stationary (making Plaintiff a Tier II candidate instead of a top ranked candidate), selected her favored, male candidate for the Squad 9 SSA position, precluded Plaintiff from serving as the Acting Supervisory Special Agent, and committed other retaliatory actions against Plaintiff.

114.    There was a causal connection between Plaintiff's complaints and the materially adverse actions taken against her.

115.    ASAC Rehler retaliated against Plaintiff for engaging in protected activity in violation of 42 U.S.C. 2000e-3(a).

116.    As a result of this conduct, Plaintiff has suffered harm, including, but not limited to, lost earnings, lost future employment opportunities, and other financial loss, as well as non-economic loss.

## EMOTIONAL AND OTHER HARM

117.    The conduct described above caused Plaintiff emotional and other forms of harm proximately caused by the FBI's discriminatory and retaliatory conduct.

## PRAYER FOR RELIEF

118.        WHEREFORE, Plaintiff requests the following relief:

   a.  Enter a declaratory judgment that the practices complained of in the Complaint are unlawful and violate Title VII of the Civil Rights Act of 1964, 42 U.S.C. § § 2000e, *et seq.*;

b. An award of all damages that Plaintiff has sustained as a result of the Federal Bureau of Investigation's conduct, including back pay, front pay, general and special damages for lost compensation and job benefits they would have received but for the discriminatory practices of the Federal Bureau of Investigation;

c. An award of a Supervisory Special Agent position (Field EDSP GS-14) in the Tampa Field Division;

d. An award of compensatory damages for emotional distress that Plaintiff has sustained;

e. Costs incurred, including reasonable attorneys' fees, to the extent allowable by law;

f. Pre-Judgment and Post-Judgment interest, as provided by law; and

g. Such other and further legal and equitable relief as this Court deems necessary, just, and proper.

This the 15th day of October 2020.

Respectfully submitted,

/s/ David J. Shaffer, Esq.
David J. Shaffer
D.C. Bar Number 413484

/s/ Kelley Brooks Simoneaux, Esq.
Kelley Brooks Simoneaux
D.C. Bar Number 187844
Admission pending in D.C. District Court

David Shaffer Law, PLLC
5012 Aurora Drive
Kensington, Maryland 20895
Phone: 202-210-7424
David.Shaffer@davidshafferlaw.com
Kelley.Simoneaux@davidshafferlaw.c
om

*Attorneys for Complainant*

## <u>JURY TRIAL DEMANDED</u>

Plaintiff demands a jury trial as to all claims so triable.


This the 15th day of October 2020.

                                        Respectfully submitted,

                                        /s/ David J. Shaffer, Esq.
                                        David J. Shaffer
                                        D.C. Bar Number 413484

                                        /s/ Kelley Brooks Simoneaux, Esq.
                                        Kelley Brooks Simoneaux
                                        D.C. Bar Number 187844
                                        Admission pending in D.C. District
                                        Court

                                        David Shaffer Law, PLLC
                                        5012 Aurora Drive
                                        Kensington, Maryland 20895
                                        Phone: 202-210-7424
                                        David.Shaffer@davidshafferlaw.com
                                        Kelley.Simoneaux@davidshafferlaw.com

                                        *Attorneys for Complainant*